IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RICHARD L. WEBER,

                        Petitioner,

    v.                                                OPINION and ORDER

STEPHANIE HOVE,                           18-cv-58-jdp

                        Respondent.

---

Petitioner Richard L. Weber, a former state of Wisconsin prisoner currently on extended supervision, seeks a writ of habeas corpus under 28 U.S.C. § 2254. He challenges his 2013 state-court conviction for operating a vehicle while intoxicated and other charges, which was based on evidence gathered after police apprehended him by entering his garage without a warrant. Weber litigated the warrantless-entry issue all the way to the Wisconsin Supreme Court. A divided court upheld Weber's conviction, but the decisive concurrence did so by finding that Weber had implicitly consented to the search, a ground that was neither briefed nor argued at any point in the proceedings. Weber contends that this deprived him of a full and fair opportunity to litigate the issue, and that the concurring opinion's analysis was contrary to controlling United States Supreme Court precedent.

I will deny Weber's petition. Weber was blindsided by the Wisconsin Supreme Court's eleventh-hour invocation of a previously unlitigated issue. But that does not mean that Weber was deprived of a full and fair opportunity to litigate it. I conclude that his claim is barred under *Stone v. Powell*, 428 U.S. 465 (1976), which sharply limits habeas review of state-court decisions on Fourth Amendment issues.

BACKGROUND

I draw the following facts from the petition, briefs, and state court records.

Weber was driving to his home in Arpin, Wisconsin, when he was spotted by Calvin Dorshorst, a deputy with the Wood County Sheriff's Department. Dorshorst noticed that Weber's car had a defective brake light and saw Weber weave from his lane of travel over the fog line. Dorshorst turned on his emergency lights to pull Weber over, but he did not activate his siren. Weber continued driving for a few seconds, traveling another hundred feet, at which point he turned into his driveway and pulled into an attached garage. Dorshorst followed and parked his vehicle in Weber's driveway, roughly 15 to 20 feet behind Weber's car.

Weber and Dorshorst exited their vehicles around the same time. Weber, who was inside the garage, moved toward the door to the attached house. Dorshorst ran into the garage, telling Weber that he needed to speak with him. At this point, Weber was on a set of steps leading to the door to his house. Weber did not pause or otherwise respond to Dorshorst. Dorshorst grabbed Weber's arm, stopping him just as he stepped through his doorway. Dorshorst told Weber that he had stopped him because of the defective brake light. He asked Weber to accompany him to Weber's car so that Dorshorst could point out the problem, but Weber would not cooperate and tried to pull away from Dorshorst. During their interaction inside the garage, Dorshorst noticed for the first time that Weber had slow, slurred speech and glassy, bloodshot eyes. Dorshorst also smelled "a strong odor of intoxicants." Dkt. 5-13, at 12.

Dorshorst eventually brought Weber outside the garage and asked if he had been drinking. Weber said that he had, but he refused to perform field sobriety tests. Another deputy arrived, at which point Weber began to resist. The deputies restrained Weber. They later asked

Weber if they could search his car, and Weber consented. The deputies found a tinfoil square with a green leafy substance that tested positive for THC, along with a metal pipe.

The state charged Weber with operating while intoxicated, operating with a prohibited alcohol concentration, possession of tetrahydrocannabinols, possession of drug paraphernalia, and resisting an officer. Weber moved to suppress the evidence obtained as a result of Dorshorst's following him into his garage without a warrant, arguing that it was the fruit of an illegal arrest. *See* Dkt. 6-1. At the evidentiary hearing on the suppression motion, Dorshorst testified that had he not entered Weber's attached garage, he would not have noticed the glassy eyes, slurred speech, or the odor of intoxicants, Dkt. 5-13, at 20, nor would he have been able to bring Weber outside and obtain his consent to the vehicle search. *Id.* at 21. The circuit court denied the suppression motion, reasoning that Dorshorst had probable cause to stop Weber (because of the defective brake light and weaving over the fog line) and probable cause to arrest him (because of his noncompliance with visual and verbal commands). Because there was probable cause that a crime was being committed, the court reasoned, "that resulted in exigent circumstances arising to hot and fresh pursuit which allowed the deputy to perform a warrantless search." Dkt. 5-14, at 11.

Weber ultimately pleaded no contest to operating with a prohibited alcohol concentration, possession of tetrahydrocannabinols, and resisting an officer; the other two counts were dismissed. The circuit court sentenced him to four years of initial confinement and four years of extended supervision on the prohibited-alcohol-concentration charge, and ordered that he pay costs on the other two offenses. Weber then appealed the circuit court's order on the suppression motion to the court of appeals, arguing that the circuit court's exigent-circumstances finding was erroneous. The court of appeals reversed. *See State v. Weber*, 2015

WI App 90, 365 Wis. 2d 606, 871 N.W.2d 866 (per curiam). It reasoned that a finding of exigent circumstances requires that there "be a potential for danger to life, risk of evidence destruction, or likelihood of escape," *id.* ¶ 7, and that the state had failed to rebut Weber's assertion that none of those circumstances were present in his case. *Id.* ¶¶ 8–9.

The state appealed to the Wisconsin Supreme Court. The court granted review and instructed the state not to "raise or argue issues not set forth in the petition for review unless otherwise ordered by the court." Dkt. 6-4, at 1. The sole issue litigated, both in the briefs and at oral argument, was whether Dorshorst's warrantless entry was justified by the exigent circumstance of hot pursuit.

The court issued its decision on November 29, 2016. Three of the seven justices concluded that the warrantless entry was justified by exigent circumstances; they reasoned that Dorshorst had probable cause to believe that Weber had committed jailable offenses prior to entering the garage (i.e., failing to stop when signaled and resisting or obstructing an officer), and that his hot pursuit of Weber was a sufficient justification for warrantless entry and arrest under the circumstances. *State v. Weber*, 2016 WI 96, ¶¶ 21–44, 372 Wis. 2d 202, 887 N.W.2d 554 (lead opinion). The four other justices concluded that Dorshorst's warrantless entry was *not* justified by exigent circumstances, because Dorshorst lacked probable cause to believe that Weber had committed jailable offenses prior to entering the garage, thereby precluding application of the hot pursuit doctrine. *Id.* ¶¶ 54–72 (Kelly, J., concurring); ¶¶ 102–111 (Ann Walsh Bradley, J., joined by Abrahamson, J., dissenting); ¶¶ 143–149 (Rebecca Grassl Bradley, J., dissenting).

But the court nonetheless reversed the court of appeals and affirmed Weber's conviction, because concurring Justice Daniel Kelly concluded that there was a separate basis

for dispensing with the warrant requirement—consent. That is, Justice Kelly concluded that Weber consented to Dorshorst's entry into the garage for the purpose of completing the traffic stop, which obviated the need for a warrant and eliminated any Fourth Amendment problem. *Id.* ¶ 75. He reasoned that Weber was obligated to stop when Dorshorst turned on his emergency lights, *id.* ¶ 77; that Weber could be presumed to know that the law required him to stop, *id.* ¶ 78; and that by driving into his garage, Weber "communicate[d] to a reasonable observer that he preferred to complete the traffic stop in his garage, rather than on the driveway." *Id.* ¶ 79. No other justice joined Justice Kelly's reasoning. But because his concurrence provided a fourth vote in favor of reinstating the conviction, it proved dispositive.

Weber moved for reconsideration. *See* Dkt. 5-10. He argued that the court had overlooked basic principles of due process by failing to provide him notice and the opportunity to be heard on the issue of consent, and that the dispositive concurrence was wrong as a matter of law. The court denied his motion in March of 2017. *State v. Weber*, 2017 WI 32, 374 Wis. 2d 163, 897 N.W.2d 54. Two justices dissented from the denial; both said they would have ordered a letter-brief response from the state on Weber's consent and due process arguments, as well as letter briefs from both parties on the validity of pooling votes. *See* Dkt. 5-11, ¶¶ 5–6 (Abrahamson, J., joined by Ann Walsh Bradley, J., dissenting). This habeas petition followed.

ANALYSIS

Under Section 2254, a federal district court may grant habeas relief only when a petitioner demonstrates that he is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Weber is in custody because of a state judgment, so Section 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996,

5

governs his petition. 28 U.S.C. 2254(d). Section 2254(d) severely restricts a federal district court's review of a state judgment:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Conner v. McBride*, 375 F.3d 643, 648–49 (7th Cir. 2004). Once the state court adjudicates the petitioner's claims on the merits, the federal court must be "highly deferential" to the state court's decision. *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015). To obtain habeas relief, the petitioner must show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "If this standard is difficult to meet, that is because it was meant to be." *Id.* at 102. Habeas relief is "a guard against *extreme* malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (emphasis added) (citation and quotation marks omitted).

Weber contends that the Wisconsin Supreme Court misapplied federal law because Justice Kelly's dispositive concurrence directly contravenes controlling Supreme Court jurisprudence governing consent in the Fourth Amendment context. But even if Weber were correct, that does not entitle him to habeas relief. Under *Stone v. Powell*, 428 U.S. 465 (1976),

litigants generally cannot relitigate motions to suppress in habeas proceedings. This is because the remedy for Fourth Amendment violations—the exclusionary rule—is prophylactic in nature; its primary purpose is to prevent future Fourth Amendment violations, not to protect the rights of the defendant in the case at hand. 428 U.S. at 479, 492. In *Stone*, the Supreme Court determined that relief under the exclusionary rule is generally unavailable in habeas proceedings because the costs of applying the rule outweigh its prophylactic benefits. *Id.* at 493–94.

There is a narrow exception to *Stone*'s bar, however, "when the State has failed to provide the habeas petitioner 'an opportunity for full and fair litigation of a Fourth Amendment claim.'" *Wallace v. Kato*, 549 U.S. 384, 395 n.5 (2007) (quoting *Stone*, 428 U.S. at 482). Weber says that this exception applies here. So the threshold inquiry is whether Weber had a full and fair opportunity to litigate the consent issue in his state-court criminal proceedings. Because I conclude that he did receive such an opportunity, the inquiry ends there.

**A. *Stone v. Powell* bars review of the merits of the Wisconsin Supreme Court decision**

A criminal defendant receives a full and fair opportunity to litigate a Fourth Amendment claim when (1) he has clearly informed the state court of the factual basis for that claim and has argued that those facts constitute a violation of his Fourth Amendment rights; (2) the state court has carefully and thoroughly analyzed the facts; and (3) the state court has applied the proper constitutional case law to the facts. *Hampton v. Wyant*, 296 F.3d 560, 563 (7th Cir. 2002) (quoting *Pierson v. O'Leary*, 959 F.2d 1385, 1391 (7th Cir. 1992)). The examples of situations that would fail to satisfy these requirements are extreme: "the judge had his mind closed to the necessity of a hearing, or was bribed, or decided . . . that probable cause is not required in Illinois, or was sleepwalking." *Cabrera v. Hinsley*, 324 F.3d 527, 531 (7th Cir.

2003). Only if the court's error "betray[s] an unwillingness on the part of the [state] judiciary to treat [the petitioner's] claim honestly and fairly" will a federal habeas court reach the merits of the Fourth Amendment challenge. *Monroe v. Davis*, 712 F.3d 1106, 1114 (7th Cir. 2013) (quoting *Stone*, 428 U.S. at 490). An error by the court is generally not enough when the petitioner had a full and fair opportunity to litigate his Fourth Amendment challenge on appeal. *See id.* at 1115–16; *see also Miranda v. Leibach*, 394 F.3d 984, 998 (7th Cir. 2005) ("An 'egregious error' in a state court's Fourth Amendment decision may suffice [to overcome the *Stone* bar], but not for the flaw it exposes in the state court's analysis but rather for what it reveals about the bona fides of the state court's handling of the Fourth Amendment claim." (citations omitted)).

Weber does not argue that Justice Kelly's analysis was so flawed that it constitutes an 'egregious error' sufficient to surmount the *Stone* bar. Instead, he contends that he was deprived of a full and fair opportunity to litigate his Fourth Amendment claim because, prior to Justice Kelly's concurrence, no judge, justice, or prosecutor had discussed consent, let alone argued that it applied to the facts of Weber's case. Their failure to do so is not surprising. Weber's behavior doesn't fit a conventional understanding of consent. Nor can a consent-based theory be easily squared with the hot-pursuit theory asserted by the state and entertained by the other justices. It would have been difficult to argue that Weber was intentionally fleeing Dorshorst while simultaneously inviting him to enter his garage. Because no one raised the consent theory before Justice Kelly relied on it, Weber says he was deprived of an opportunity to argue the consent issue to the state court.

But being blindsided by an unforeseen judicial decision is not enough to overcome *Stone*. Weber had an opportunity to inform each state court of the factual basis of his Fourth

8

Amendment claim—that Dorshorst had entered his home without a warrant. An unspoken premise of this argument was that Weber did not consent to Dorshorst's entry. The circuit court held an evidentiary hearing at which both parties had an opportunity to develop the facts that they believed supported their positions. Although the parties did not elicit testimony or make legal arguments specifically on the issue of consent, no closed-minded judge or procedural obstacle prevented them from doing so had they wanted to. The circuit court, court of appeals, and Wisconsin Supreme Court analyzed the facts in the record and applied what they presumably believed was the proper constitutional case law. And when the supreme court's decision went off in an unexpected direction, Weber argued the consent issue in a motion for reconsideration. Weber says that his motion for reconsideration did not constitute a full and fair opportunity to litigate the consent issue because it "was simply asking for the opportunity to brief the dispositive issue. . . . This was not litigation. It was a request for the opportunity to litigate." Dkt. 14, at 5. But a review of that motion shows that it included a full-throated argument on the merits and made many of the same points that Weber now makes in his habeas petition. *See* Dkt. 5-10, at 14–18.

The case law suggests that Weber received a full and fair opportunity to litigate, even though he had no chance to litigate the consent issue until the motion for reconsideration. In *Hampton v. Wyant*, for instance, the Court of Appeals for the Seventh Circuit held that a state court's reliance on arguments and authorities not cited by the parties "show[ed] industry rather than the sort of indolence that might deprive the parties of a fair hearing." 296 F.3d at 564. The federal district court in that case had granted the petitioner's habeas petition in part because the state court had engaged in independent research not based on the parties' briefs—

research that the district court concluded was faulty. In reversing the grant of that petition, the court of appeals rejected the petitioner's attempt to overcome the *Stone* bar:

> The [state] court's rationale, counsel contended, was the result of independent research that went wrong, and according to counsel the court's very act of striking out on its own deprived Hampton of a full and fair opportunity to litigate. This would make a virtue of mechanical jurisprudence: a court that trudged through the briefs would be safe under *Stone*'s umbrella, but a court that thought the briefs inadequate and tried to think independently would invite federal intervention to correct any error. That can't be right. . . [I]t is the sleepwalking judge, not the diligent one, who deprives the litigant of the personal right to careful, individual consideration.

*Id.* 564–65. The same principle applies here. Justice Kelly's concurrence went well beyond the scope of the parties' briefs, and he may have erred in his legal analysis. But *Hampton* makes clear that even if a judge's "independent research was faulty, that's the sort of error that *Stone* puts off limits as the basis of collateral relief." *Id.* at 564.

Weber attempts to distinguish *Hampton* by limiting it to its facts. In *Hampton*, the petitioner "concede[d] that he had (and used) an unfettered opportunity to develop the facts and present his legal arguments" and that "the state trial and appellate judges fairly summarized the facts." *Id.* at 564. Weber says that, unlike Hampton, he had no opportunity to develop the facts or present his legal arguments related to consent. But Weber does not identify what additional facts he would have developed during the suppression hearing had he known that the consent issue would become relevant later. Nor does he explain why he had any less of an opportunity to present his legal arguments than Hampton did. In *Hampton*, the petitioner argued that he could not be faulted for failing to argue a ground that "became relevant only in light of a novel approach taken by the state judges." *Id.* The court of appeals did not take that to mean that Hampton hadn't received a full and fair opportunity to litigate.

10

Weber also contends that, unlike in *Hampton*, the state court in his case did not fairly summarize the facts. More specifically, Justice Kelly's concurrence didn't fairly summarize the facts, because it "ignored everything that happened after Mr. Weber exited his car (i.e., Mr. Weber walking away from the deputy, not stopping when instructed, being physically removed from his door, and not cooperating in that he received a resisting charge)." Dkt. 14, at 10. But the facts that Weber accuses Justice Kelly of ignoring already existed in the underlying record and were reported in the opinions of other justices. *See Weber*, 2016 WI 96, ¶¶ 5, 7, 93. Weber does not contend that the underlying record misrepresents the relevant facts; indeed, he repeatedly cites to them as unequivocally demonstrating his non-consent. So the crux of Weber's argument is not that he was deprived of an opportunity to develop the facts relevant to his Fourth Amendment claim; it is that Justice Kelly interpreted those facts in an unreasonable way. That goes to the correctness of his ruling, not whether Weber had a full and fair opportunity to litigate. *Stone* bars me from considering the merits of Weber's petition simply because the dispositive concurrence may have been incorrect.

**B. Cases cited by Weber do not overcome the application of *Stone***

Weber's unfettered opportunity to develop the facts distinguishes his challenge from the three authorities he cites for the proposition that an unforeseeable judicial ruling can deprive a criminal defendant of a full and fair opportunity to litigate. In *United States ex rel. Bostick v. Peters*, 3 F.3d 1023 (7th Cir. 1993), a state trial court granted Bostick's motion to suppress evidence obtained from a search of his suitcase based on allegations that Bostick provided in a sworn affidavit. The state court of appeals reversed the trial court and denied the suppression motion because it deemed Bostick's affidavit not competent evidence to support his burden of proof. Back in the trial court, Bostick asked for another hearing in which to offer

11

testimony substantiating the allegations in his motion to suppress. But the trial court interpreted the appellate court decision as disposing of Bostick's claim on the merits and denied his request. As a result, Bostick was affirmatively precluded from developing the evidence he needed to prevail on his Fourth Amendment claim. The Court of Appeals for the Seventh Circuit held that the *Stone* bar did not apply in this scenario. It reasoned that "the unanticipated and unforeseeable application of a rule on appeal prevented the state courts from properly considering the merits of the petitioner's claim," and as a result, "Bostick's factual allegations were never considered on the merits." 3 F.3d at 1029, 1028. Contrast that with the situation here, where Weber is contesting a justice's interpretation of the facts, not the integrity of the underlying factual record.

Similarly, in *Riley v. Gray*, 674 F.2d 522 (6th Cir. 1982), and *Bailey v. Duckworth*, 699 F.2d 424 (7th Cir. 1983), federal courts of appeals held that habeas petitioners had not received full and fair opportunities to litigate when state appellate courts denied their suppression motions by holding sua sponte that they lacked standing to challenge the Fourth Amendment violations at issue (i.e., a reasonable expectation of privacy in the place searched). Neither petitioner was permitted to return to the trial court to develop the factual record necessary to establish standing. *See Bailey*, 699 F.2d at 425 ("The flaw in the state's position is its attempt to consider the validity of the warrant and the standing issue as one fourth amendment claim. The record clearly indicates that while petitioner was afforded an opportunity to fully and fairly litigate the validity of the search warrant, he has not been afforded the same opportunity to litigate the standing issue."); *Riley*, 674 F.2d at 527, 527 n.6 ("Although . . . a remand is often not necessary, the record in this case indicates that the petitioner could have proven his standing to challenge the search had he anticipated the

appellate decision." (citations omitted)). In this case, by contrast, no judicial decision or procedural bar prevented Weber from developing the record he needed to prevail on his Fourth Amendment claim; Weber's complaint is what Justice Kelly did with that record.

**C. The consent issue falls within the *Stone* bar**

Weber contends that consent is categorically different from a generic Fourth Amendment claim and that, like standing, it cannot be raised sua sponte by a judge and applied dispositively without depriving a defendant of his full and fair opportunity to litigate. Whereas the prosecution has the burden of proving most exceptions to the warrant requirement by a preponderance of the evidence, *see United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000), consent "receive[s] special treatment with respect to proof." 6 Wayne R. LaFave, *Search and Seizure* § 11.2(b) (5th ed. 2012). To admit evidence obtained without a warrant on a consent theory, the prosecution must prove that consent was freely and voluntarily given by clear and convincing evidence. *State v. Sobczak*, 2013 WI 52, ¶ 11, 347 Wis. 2d 724, 833 N.W.2d 59, 63. Weber contends that Justice Kelly's sua sponte decision to raise and decide the Fourth Amendment claim on consent grounds, without the benefit of an evidentiary hearing on the issue, relieved the state of its heightened burden of proof.

Justice Kelly's unusual maneuver raises concerns about due process and procedural fairness. Weber cites *State v. Jiles*, a case about the admissibility of statements allegedly obtained in violation of *Miranda v. Arizona*, in which the Wisconsin Supreme Court stressed that a "court must not permit itself to become a witness or an advocate for one party. A defendant does not receive a full and fair evidentiary hearing when the role of the prosecutor is played by the judge and the assistant district attorney is reduced to a bystander." 2003 WI 66, ¶ 39, 262 Wis. 2d 457, 478, 663 N.W.2d 798, 908. But such generalized due process and

13

procedural fairness concerns are separate from the question whether Weber received a full and fair opportunity to litigate for the purpose of avoiding *Stone*'s presumptive bar on Fourth Amendment habeas actions. Weber says that a hearing on the consent issue was necessary to his full and fair opportunity to litigate, but he points to no consent-specific evidence that he would have developed at such a hearing and notes that "[t]he only facts relevant to consent show Mr. Weber did not consent." Dkt. 14, at 7. Weber could (and did) raise his interpretation of the facts already of record in his motion for reconsideration. *See* Dkt. 5-10, at 4–14. In light of these considerations, I cannot say that Weber was denied a full and fair opportunity to litigate the consent issue for *Stone* purposes.

My role in analyzing Weber's habeas petition in light of *Stone* and its progeny is "not to second-guess the state court on the merits of [his] claim, but rather to assure [myself] that the state court heard the claim, looked to the right body of case law, and rendered an intellectually honest decision." *Monroe v. Davis*, 712 F.3d 1106, 1114 (7th Cir. 2013). Weber makes a good case that the reasoning of the dispositive concurrence was incorrect as a matter of fact and law, but he has not shown that the state court process he received amounted to a sham or betrayed an unwillingness to treat his claim honestly and fairly. *Id.* This case illustrates the severity of the *Stone* doctrine, which puts most erroneous state-court decisions on Fourth Amendment issues beyond the power of a federal court to remediate.

**D. Certificate of appealability**

The only matter remaining is whether to issue a certificate of appealability pursuant to Rule 11(a) of the Rules Governing Section 2254 Cases. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The standard for making a "substantial showing" is whether

"reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). I conclude that Weber has not shown that he is entitled to relief, but the question is fairly debatable, so I will issue a certificate of appealability.

ORDER

IT IS ORDERED that petitioner Richard L. Weber's petition for a writ of habeas corpus, Dkt. 1, is DENIED. A certificate of appealability shall issue.

Entered March 14, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge